And the last case we have is the state of Jotena Carter v. Cambridge Sierra Holdings, case number 24-3071. Good morning. May it please the court, CJK, Ikonte. Give me one moment, counsel, while I think counsel's setting up at the table. Okay. I think we're ready to begin. Okay. Good morning. May it please the court, CJK, Ikonte, for the plaintiff's appellant, estate of Jotena et al. I'd like to reserve two minutes for rebuttal. Okay. The district court, the court should reverse the grant of summary judgment because in granting summary judgment, the district court failed to follow the other case and the sellotext. In either case, the court says that a party opposing a motion for summary judgment would not need to present any evidence if the moving party had failed to present any admissible evidence. Also, in the sellotext, where the court said summary judgment can be granted if the initial, if the party moving for summary judgment had met its burden by showing through the pleadings, discovery responses, answers to interrogatories, that evidence does not exist to support the claims in the lawsuit. That it's not, that standard was not met in this case. Further, the district court erred in ignoring the fact that the plaintiffs in this case invoked the doctrine of res ipsa locator in arguing that COVID-19 or coronavirus does not just get infected without an affirmative act or something that was done by a party. The district court ignored that. Also, though there is no counter gross appeal in this case, but if the court would want to address the issue of COVID-19, our position is that the district court properly ignored any arguments that relates to COVID-19 because simply what was involved in this case were inaction. Mr. Is it, is it fair to say that the record doesn't shed light on where Ms. Carter was exposed to COVID-19. I mean, do we know the record. Do we know if it happened at the nursing home versus Kaiser or somewhere else. Is there anything to any way to know one way or the other, where the transmission occurred. Yeah, yes, you know, one thing we know it's at this stage summary judgment state. One thing we know was that when Miss Carter was admitted to the facility. She was COVID-19 negative. By the time she got to Kaiser, and was tested on April 14, she was now COVID-19 positive. The distress that led to her being transported to Kaiser occurred on April 13. So somehow between when she was admitted into the facility in March, on March 19, and when she was transported to Kaiser, she got COVID-19. There is no dispute that during that period, Miss Carter was under the exclusive control of the facility. Also, the record. If you look at page, volume five of the respondents excerpts. If you look at page 1193, 1201 and 1203, they did acknowledge that Miss Carter was receiving therapy in her room, because some patient had been exposed to COVID-19. The record did not say that Miss Carter was receiving therapy in her room because she was COVID-19 positive. So as at March 19, and the period following March 19, she was not COVID-19. So she must have, I mean, at this stage, if we make that inference, I got into a place, I did not have COVID-19, I was there for a period of time, was diagnosed with COVID-19, then I think a fair inference from that was that she contracted COVID-19 in that facility. Does that mean that anybody at the facility was negligent? The matter of transmission of COVID-19, at that point, yes, because of the mode of transmission of COVID-19, she has to have been exposed to COVID-19. The mechanism of COVID-19 transmission at that time is that you have to have contact with someone that has COVID-19, which was why at that period, people were wearing masks, there was issue of distance, you know, you don't get, I think it was three feet away during that period. So, yes, there has to be some negligence on the part of someone in the facility for that to have occurred. Well, do you know if, is there anything in the record that shows that any of the workers at the facility who dealt with Ms. Carter either didn't wear a mask or had COVID or, you know, something that shows that there was some duty of care that they breached? What we do know was there was a mask, there was COVID-19 in the facility during that period that resulted in fatalities. I mean, that's part of the record at that point. And during that period of time, there was an infection that occurred. And as a result of that, some people who were infected actually died. So, we know that happened during that period. But what you're saying is that they're responsible because she contracted COVID-19 while in the facility. That's really what your claim comes down to. The claims come down to the fact that they did not take care of her. There was inaction on their part, which resulted in her contracting COVID-19, because you don't just get COVID-19. And also, during the period she was there, there was a widespread COVID-19 infection in the facility that resulted in fatality. What do you contend they should have done while she was there to avoid COVID? During the period that she was there, I mean, the record did not really show, but one of the things that they could have taken a step in prevention of COVID-19 was to minimize contact with anybody who has COVID-19. I mean, the fact that there was a widespread COVID-19 that resulted in fatality in the facility means they should have taken some affirmative steps to protect those vulnerable people who were in the facility. I mean, if we don't have that record. With respect to her roommates, I thought the record showed that Robbie Carter didn't have any information that any of the roommates ever had COVID-19. Is there anything in the record that supports her proximity to anyone with COVID-19? Well, none of her roommates had COVID. We do not have anything to show that any of her roommates had COVID-19. But it still goes back to what we were saying. How did she contract COVID-19? One, we're saying we can make the inference at this stage. Listen, there was a widespread COVID-19 in that facility resulting in fatalities. She was exposed to the staff members of that facility that were taking care of her. And during that period, she was not allowed visits from family members. So clearly, all her contacts were with the staff or the employee of the facility. I credit your argument that they had a duty to this patient, of course, and to all of their residents. But then what was the breach of the duty? Is there any testimony that shows that their mitigation plan was insufficient given the state of COVID knowledge at the time? Or anything else that would show that the facility breached a duty of care? Well, the issue was the state of the discovery in the case. We're saying there was a little bit of resistance of discovery in providing that. But we did point out in one of the exhibits there that they, sorry, we did point out that the records, the policies and procedures they had in place was not really up to date at that point. I can see my time is up. Thank you. Let me see if, we'll give you a little time for rebuttal. Thank you. Good morning, Your Honors. May it please the court, Lon McIntyre on behalf of the defendant and appellee, Cambridge Sierra Holdings. In this case, the case obviously involves the unfortunate death of Jotina Carter, who is a patient at the Skilled Nursing Facility during the very early days of the COVID-19 pandemic. Unfortunately, she contracted COVID-19. The record doesn't establish where or how she contacted it. But on the evidence that was presented in this case, summary judgment was properly granted and should be affirmed. With respect to the lack of evidence that was the basis for the summary judgment motion, the record sheds no light on really where Ms. Carter contracted COVID-19. We have medical records in the record that established that at no point in time was she ever diagnosed with COVID-19. The facility had standing orders to observe her and take any precautions and use PPE as indicated. That's at SER 1380. They also ordered labs or COVID-19 testing if indicated or ordered on that same date. And that was at the beginning of her admission to the facility. When she arrived at the facility, do records show that she was not tested or that she was or was not tested positive? The records show that there was no positive test at any time during her residency at the facility. And in fact, at the time that she was transferred to Kaiser, the records established that her vital signs were normal. She was under no respiratory distress that could be a symptom of COVID. We just simply don't know whether she contracted. Where else would, you know, here's this individual in this closed, she's like in a closed environment, correct? And even crediting that the Cambridge tries to do everything they can to prevent COVID. She arguably has no COVID symptoms or tests before she leaves. But then when she arrives at Kaiser, she does. So given the timing for contracting and showing symptoms, is there any other explanation? Well, there could be that she contracted it from the paramedics who transferred her to the hospital. She could have contracted it. Instantaneously upon admission, she's tested positive, right? I believe the day she arrived, she did test positive. She arrives from the facility into an ambulance or transport. She arrives at Kaiser. She tests positive. I think that the point here is that there, in fact, is no evidence to establish exactly where she contracted it. It is possible that she contracted it in her transfer. It would be a reasonable inference that she contracted it at the facility. I don't know that it is. But more importantly, there's no evidence that that was the result of any negligence on the part of the facility. That seems to me to be the real question. There didn't seem to be anywhere else she got it unless it came from heaven or something. So there she is, and now she has COVID. So the question is really negligence. It boils down to negligence, obligation, duty of care, doesn't it? Yes. I mean, I think that is the ultimate issue is that there was no evidence of any negligence on the part of the facility. We have the medical records that indicate that she never tested positive, although she was ordered to be observed and watched for any kind of symptoms. We have the deposition testimony of the three plaintiffs, the heirs, who indicated that they don't know how she got it. They don't know if her mother was ever in a room with a COVID positive roommate. They don't know if her mother was ever in contact with a COVID positive person at any time. They simply don't know how she got it. And in fact, Tracy Scott testified that no one in the family had ever suggested that she got it at the facility. We have the medical records establishing no sign of COVID. We also have the allegations of the third amended complaint, which are that she tested positive at the hospital on 4-14-20, which I think could be an inference that she contracted it at the hospital. The other thing we have in evidence is that the facility had a COVID-19 mitigation manual and had an extensive, robust infection prevention and control program. And plaintiffs, we have absolute absence of any discovery responses from plaintiffs to support that there was a breach of the duty of care, that there was any negligence that occurred at the facility. They didn't respond to interrogatories that were propounded. And with respect to the requests for admissions that were propounded, they simply responded admit or deny, but without any factual basis, which under Federal Rule of Civil Procedure 36 can be a basis for deeming those requests for admissions to have been admitted. We also contend that the expert and non-expert declarations were improperly excluded, but certainly in any event, even if the experts were properly excluded, the non-expert declarations should not have been. It was not part of their objections to or statements in response to the separate statement of facts. And both of those individuals, Mr. DeJesus and Mr. Campbell, testified about the robust infection prevention protocol and the use of PPE and the fact that... But, you know, I mean, those were excluded because of the failure to identify them in Rule 26 disclosures. Is that right? Is that issue even before us? I mean, there's no cross appeal. Is that something we would even consider? I think we do consider it because they were evidentiary objections that were made at the summary judgment motion, and we're contending that the court abused its discretion in making those evidentiary rulings. It doesn't make any difference to my ruling in any way. Isn't that what the district court said? Correct. Correct. The district court did not rely on... So it's a wash. Yeah. But, I mean, I think they do constitute, if improperly excluded... They have to come forward with some evidence to show that they can make their burden. Right. And they did not. So they didn't take any depositions of the caretakers who had control over her? Correct. Their sole and exclusive response to the summary judgment motion was that the supporting declarations were improper and should be excluded. The court did exclude them, and they made no further attempt to... Well, they argued that the presumption or the evidentiary presumption of race if so awkward or should apply, but... Yes. They made that legal argument. The district court said they didn't meet the three-part... They didn't satisfy the three-part test. That's correct. Yes. And the district court was correct with that. I think there's also another basis for affirming the summary judgment motion that we addressed in the briefing, and that's the issue of PrEP Act immunity. And we do contend that, in this case, that plaintiff's claims are about alleged inadequacies in the facility's infection control program, how much PPE was used, testing, whether it was properly or timely used, treatment, the manner and allocation of the infection control program, which includes covered countermeasures under the PrEP Act. And we contend that those allegations fall squarely within the immunity provisions of the PrEP Act. We are a covered person. This court, in the Maney v. Brown decision, extended PrEP Act immunity to program planners, which we are. The facility is considered to be a program planner in that it administers a program for application of administration of a countermeasure in their facility. And as this court said in the Maney decision, immunity applies to policy-level failure to administer claims. And we think that that conclusion is absolutely appropriate. The statutory text supports the broad scope of the PrEP Act immunity provision. Administration is broadly defined. Covered persons are broadly defined. All claims for loss is broadly defined. The term relating to in the statute that provides for immunity is also broadly defined. And as this court said in Maney, Congress used terms that plainly and unambiguously define the broad scope of immunity. There was also an elder abuse claim, but I think that has not, that's not before us now, is it? I agree. It's been abandoned. It wasn't opposed in the opposition to the summary judgment motion. It was not raised on appeal. Okay. Yes. Unless the court has any other questions? I don't think so. Okay. Thank you, Your Honor. Thank you, counsel. Mr. Ikonte, we'll give you a couple minutes for rebuttal. Okay, Your Honor. I think one of the issues we'll look at is what is our obligation when a party for moving for summary judgment fails to meet its initial burden? In striking the evidence that the party submitted in terms of their declaration, and they are both by experts and non-experts, we're left with nothing. And do we still have an obligation then to make an affirmative difference in terms of opposing the summary judgment? I think that going by our decades in Silothex, we actually are not required to do anything, and the court need not go further in evaluating the evidence that was presented since the moving party had failed to meet its initial burden. So we do not have any evidence that they have presented to either negate an element of our claim for them to go forward with the summary judgment motion. Also, in terms of the elder abuse, we argued that since the moving party failed to meet its obligation under the law, then we are not required to make any affirmative showing. So I think that the court should look at it also. What is our obligation? What is the obligation of the non-moving party when the moving party fails to meet its initial burden? With that, I submit. If the court has any additional questions, I'll submit. Any questions? No. Thank you, counsel. Thank you both for your helpful arguments. The matter will stand submitted and court is adjourned.
judges: McKEOWN, PAEZ, SANCHEZ